**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**LOUIS D. DENNISTON,**
         **Plaintiff,**

  v.                 **5:15-CV-1228**

**CAROLYN W. COLVIN, Acting**
**Commissioner of Social Security,**

         **Defendant.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


**DECISION & ORDER**

**I. INTRODUCTION**

  Plaintiff Louis Denniston brought this action under the Social Security Act, 42 U.S.C. § 405(g), to review a final determination by the Commissioner of Social Security denying his application for benefits. Pursuant to Northern District of New York General Order No. 8, the Court proceeds as if both parties had accompanied their briefs with a motion for judgment on the pleadings.

**I. PROCEDURAL HISTORY**

  On August 28, 2012, Plaintiff filed an application for Supplemental Security Income under Title II of the Social Security Act. On October 4, 2012, Plaintiff filed an application for disability insurance benefits under Title XVI of the Social Security Act. An initial administrative determination denied the claims on January 14, 2013. Plaintiff filed a timely

1

request for a hearing on February 6, 2013. Administrative Law Judge ("ALJ") Dale Black-Pennington presided over a hearing on April 30, 2014. The ALJ issued an unfavorable decision on May 15, 2014, which the Plaintiff appealed. On August 12, 2015, the Social Security Appeals Council rejected Plaintiff's appeal, making the ALJ's decision the Commissioner's final decision. This action followed.

As indicated above, Plaintiff brings this action under § 205(g) of the Social Security Act ("Act"), as amended, 42 U.S.C. § 405(g), to review the Commissioner's final decision.

## II.     FACTS

The parties do not dispute the underlying facts of this case. The Court assumes familiarity with these facts and will set forth only those facts material to the parties' arguments.

## III.    THE COMMISSIONER'S DECISION

The ALJ engaged in the required five-step analysis to determine whether a claimant qualifies for disability benefits. See Social Security Administrative Record ("R."), dkt. # 11, at 10-17. First, the ALJ determined that Plaintiff had engaged in substantial gainful activity since September, 2013, working as a janitor at a high school. Id. at 12. There was, however, a continuous 12-month period during which Plaintiff did not engage in any gainful activity. Id. The ALJ's decision addressed that period. Id. Second, the ALJ found that Plaintiff suffered from the severe impairments of seizure disorder and asthma. Id. The ALJ next concluded that Plaintiff did not have an impairment or combination of impairments that met or medically exceeded the severity of a listed impairment. Id. at 13. His seizure disorder failed to meet the listing requirements. Id.

2

Next, the ALJ found that the Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels. Id. at 14. The ALJ assigned a number of nonexertional limitations, however: Plaintiff was to "avoid driving, vibrations, unprotected heights, heavy moving mechanical parts, and concentrated exposure to dust, fumes, smoke, and other known respiratory irritants[.]" Id. He was also permitted "less than one monthly absence." Id. The ALJ noted that Plaintiff's clinical findings were "essentially benign." Id. Plaintiff did not display "any acute distress" when examined, and doctors found plaintiff's gait normal, that he could walk on heels and toes without trouble, and he had normal reflexes and strength in the upper and lower extremities. Id. He had no "sensory deficits." Id. His neurologist reported a normal neurologic examination, and the examining physician did not assign any significant limitations or restrictions. Id. Dr. Joseph Perizo, who performed this examination, ordered that Plaintiff avoid smoke, dust and other respiratory irritants. Id. Still, Perizo concluded based on his tests and the limited available medical record, that Plaintiff could perform all work with restrictions. Id.

The ALJ found "limited substantive support" in the medical records for Plaintiff's claims "of disabling symptomatology." Id. at 15. His seizures were controlled by increases in medication, and seizures appeared only when he failed to comply with his dosage requirements. Id. He underwent "numerous" EEG studies, all of which were normal. Id. He had been forced to go to the emergency room, but "improved with intravenous Keppra therapy." Id. Plaintiff also engaged in a significant amount of daily activities, going grocery shopping, cleaning and cooking. Id. While Plaintiff clearly suffered from symptoms related to his condition, no evidence supported a claim that such symptoms occurred frequently or intensely enough "as to render him incapable of performing

3

substantial gainful activity on a sustained basis." Id.

After assigning this RFC, the ALJ concluded that Plaintiff was unable to perform his past relevant work as a tire technician, plumber and laborer. Id. The transferability of Plaintiff's job skills was not material to the disability determination, however, because "using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills." Id. at 16.

Finally, the ALJ determined that, based on Plaintiff's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that Plaintiff oculd perform. Id. Finding that Plaintiff's nonexertional limitations "compromised" his ability to perform work at all exertional levels, the ALJ turned to a vocational expert to assess the availability of jobs. Id. The vocational expert testified that "jobs exist[ed] in the national economy for an individual with the claimant's age, education, work experience and residual functional capacity." Id. The vocational expert determined that Plaintiff could work as a dining room attendant, counter supply worker, baggage porter, and cafeteria attendant. Id. All of these jobs save baggage porter existed in significant numbers in the national economy. Id. As such, the ALJ found, "[b]ased on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." Id. at 17. The ALJ therefore concluded that Plaintiff was not disabled. Id.

## IV. STANDARD OF REVIEW

The Court's review of the Commissioner's determination is limited to two inquiries. See 42 U.S.C. § 405(g). First, the Court determines whether the Commissioner applied

4

the correct legal standard. See Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990). Second, the Court must determine whether the Commissioner's findings are supported by substantial evidence in the administrative record. See Tejada, 167 F.3d at 773. A Commissioner's finding will be deemed conclusive if supported by substantial evidence. See 42 U.S.C. § 405(g); see also Perez, 77 F.3d at 46; Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984) ("It is not the function of a reviewing court to determine *de novo* whether a Plaintiff is disabled. The [Commissioner's] findings of fact, if supported by substantial evidence, are binding.") (citations omitted).

In Social Security cases, substantial evidence consists of "more than a mere scintilla" and is measured by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)). Where the record supports disparate findings and provides adequate support for both the Plaintiff's and the Commissioner's positions, a reviewing court must accept the ALJ's factual determinations. See Quinones v. Chater, 117 F.3d 29, 36 (2d Cir. 1997) (citing Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982)); Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990). Although the reviewing court must give deference to the Commissioner's decision, a reviewing court must bear in mind that the Act is ultimately "'a remedial statute which must be 'liberally applied;' its intent is inclusion rather than exclusion.'" Vargas v. Sullivan, 898 F.2d 293, 296 (2d Cir. 1990) (quoting Rivera v. Schweiker, 717 F.2d 719, 723 (2d Cir. 1983)).

**V. DISCUSSION**

Plaintiff offers two grounds for challenging the ALJ's opinion. The Court will address each in turn.

### A. Effects of Anti-Seizure Medication

Plaintiff first argues that the ALJ erred by failing to consider properly the side effects of his anti-seizure medication on his ability to work. The Social Security regulations require that the ALJ consider the effects of treatment in determining a plaintiff's RFC, and Plaintiff contends that the ALJ ignored Plaintiff's testimony on the effects of medication on him. Such medication, he claims, caused nausea and sleepiness.

The Social Security Commissioner has determined that disability evaluators are to consider "[t]he type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms." SSR 16-3p. Such determinations are also to consider "[t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication.)" SSR 96-8p. Plaintiff contends that the ALJ failed to follow these requirements.

In noting that Plaintiff had the severe impairments of seizure disorder and asthma, the ALJ found that in May 2012, Plaintiff informed his primary care practitioner "that he wanted to go off his seizure medication, because his last seizure was two years before." R. at 12. Plaintiff took Dilantin to control his seizures. Id. In August 2012, Plaintiff "reported having a seizure due to not taking his medication for two days." Id. "His Keppra prescription was increased." Id. In September of that year, he told doctors he had suffered "a seizure due to not taking his medication for two days" and also "reported feeling constantly nauseous." Id. By October of that year, plaintiff "did not report any

6

further seizures." Id. During a visit to a neurologist in September 2012, Plaintiff reported that he had suffered "nocturnal seizures and one daytime seizure," that last occurring on September 10, 2012. Id. at 13. Testing revealed no significant abnormalities in Plaintiff's brain. Id. A November 2012 examination by that neurologist was normal. Id. The neurologist prescribed Keppra. Id.

Plaintiff returned to his primary care physician in January 2013, telling her he had not been experiencing seizures. Id. When he next returned to his neurologist, Plaintiff informed him that he had suffered two seizures since January 2013. The neurologist increased his Keppra prescription, and seizures ceased until his next appointment, in April 2013. Plaintiff suffered a seizure and went to the emergency room in September 2013, after he failed to take his medication the previous night. Id. Plaintiff was "alert, awake and . . . in no distress" during his examination. Id. He received intravenous Keppra and Plaintiff improved and was discharged. Id. Claimant told his neurologist that he had not increased his Keppra dosage until he had his seizure in September, and the neurologist continued to prescribe the medication. Id. In assessing Plaintiff's RFC, the ALJ found:

> Despite the claimant's allegations of disabling symptomatology, the undersigned finds limited substantive support. The claimant's seizure disorder was controlled with increased medication. When the claimant was non-compliant with medication, he experienced seizures. Additionally, numerous EEG studies were normal. No epileptiform activity or seizure was recorded. Additionally, during emergency room visits, the claimant improved with intravenous Keppra therapy.

R. at 15. Plaintiff contends that the ALJ's decision is not supported by substantial evidence and contrary to Social Security Administration rules because the ALJ did not consider the side effects of Plaintiff's anti-seizure medication.

The evidence cited above indicates that the ALJ considered the effects of the

7

seizure medication. The ALJ evaluated the evidence and concluded that Plaintiff suffered seizures when he failed to take an appropriate dose of his seizure medication. The ALJ also pointed to medical evidence in the record which established, however, that Plaintiff responded positively to appropriate doses of his anti-seizure medication. When he took the medication, the ALJ pointed out, Plaintiff's seizures were under control. When he failed to take the medication or tried to reduce the dose, he suffered seizures. In that sense, the ALJ had substantial evidence to support her conclusion that Plaintiff's seizures could be controlled with proper medication.

Plaintiff contends, however, that the ALJ failed to consider the side effects of Plaintiff's medication, which violates the rulings cited above. Plaintiff did testify that he had not had seizures since September 2013, but that doctors were still adjusting his medication, and he experienced "small seizures to where my body, like my muscles would twitch or sometimes I would forget what I'm doing and kind of be like in a daze." R. at 37. He had not had a "full-blown seizure" since starting on Keppra, but had occasional "mild seizures." Id. at 39. He also testified that the medications caused him to "feel dizzy and drowsy," which led him to "take them at night[.]" Id. at 38. Despite this testimony, substantial evidence supported the ALJ's assessment of Plaintiff's limitations. Plaintiff points to other evidence that he contends demonstrates that the seizure medication had negative side effects on him, but this evidence is equivocal.[1] In the end, Court finds that

---

[1] Plaintiff points to treatment notes from a neurologist, Alexandr Safarov, MD, from November 30, 2012. R. at 220. Safarov recorded that Plaintiff "reported 2 seizures while on Keppra." Id. Safarov further reported, however, that Plaintiff's "last seizure happen[ed] on September 10 when he did not take medication for 2 days. No new events since he started medication regularly. He did have neck pain after event. Today he came back for follow up. He decreased Keppra on his own to 2 tab at night time 1 month ago because

8

the ALJ had substantial evidence in the form of treatment notes and other medical reports indicating that anti-seizure medication had a net positive effect on Plaintiff's health, controlling his seizures and permitting him to function normally. The ALJ considered the effects of medication on Plaintiff and concluded that the medication helped him avoid seizures. The RFC also appears to have recognized some side effects and limitations form the medication. The RFC, after all, established that Plaintiff's condition required an occasional absence, probably less than one a month. R. at 14. Since an ALJ need not "reconcile every conflicting shred of medical testimony . . . [i]t is sufficient that the ALJ noted he carefully considered the exhibits presented in evidence in reaching his decision." Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1982). The Court finds that the ALJ had substantial evidence for her conclusions as to the effects of Plaintiff's anti-seizure

---

he felt somewhat sleepy. Today he reports no new seizures." Id. While the ALJ may have read this evidence to report drowsiness as a side effect of the medication, the ALJ also had substantial evidence for her opinion that the medication improve Plaintiff's condition. The record presents evidence that any side effects were minor and balanced out by control of the seizures the medication provided.

    Plaintiff also points to an office note from his primary-care provider on November 19, 2012. See R. at 252. That note states that Plaintiff describes a "follow up visit for seizures, no further seizures. Says he feels constantly nauseous since last seizures. Does not feel right." Id. Plaintiff contends that this record represents evidence of serious side effects from the seizures. While such evidence may indicate the anti-seizure medication made Plaintiff nauseous, such evidence could also support a view that the seizures themselves and their aftermath caused his medical condition. As such, the ALJ did not ignore evidence of the side effects of the medication; she could reasonably conclude from this evidence that Plaintiff's illness was unrelated to nausea.

    Finally, Plaintiff points to the records from an appointment with Plaintiff's primary care physician on May 10, 2012. The records state that "[p]atient would like to discuss going off Seizure medication, last episode was 2 yrs ago." R. at 261. These records do not discuss any side effects from the medication, and thus do not support Plaintiff's argument in this respect. They provide more support for the ALJ's finding that the anti-seizure medication actually improved Plaintiff's condition and helped to control his seizures.

medication and thus properly considered that medication in reaching her decision on his RFC. The Plaintiff's motion will be denied in this respect.

### B. Failure to Consider Plaintiff's Neck Impairment

Plaintiff also contends that the ALJ erred by failing to consider the effects of his neck injury on his ability to work. Though Plaintiff acknowledges that the injury was not a severe one under the regulations, he contends that the ALJ should have added additional restrictions in consideration of the "moderately degenerative disc disease seen at the C5-6 level" in a neck x-ray on February 7, 2013. Failing to do so violates Social Security rules, Plaintiff claims. The Defendant responds that the ALJ did consider Plaintiff's neck impairment, and that in any case Plaintiff failed to present any evidence to indicate that his neck injury limited his ability to perform any work.

The record indicates that Plaintiff complained of neck pain and limitations from that pain. He completed an Adult Function Report on November 7, 2012. R. at 172-185. In that report, Plaintiff contended that he first began to feel pain in his neck on July 1, 2012. Id. at 180. Plaintiff complained of an "aching" pain "mostly" in his left side. Id. The pain radiated down his lower back. Id. at 181. The pain had changed since he first noticed it, moving from "livable to noticable [sic]." Id. The pain came in the morning and late night, and worsened when Plaintiff lifted something heaving too high or when he slept the wrong way or moved his head quickly. Id. Plaintiff had "constant" pain from this injury which he had treated with Flexeril since August 2012. Id. The medication did not relieve his pain. Id. Plaintiff also used ice packs and extra pillows to ease his discomfort. Id. at 182. The forced him to "watch how I move or lift." Id.

Medical records reflect that Plaintiff–for at least a portion of the relevant period–complained of neck pain. On August 22, 2012, Plaintiff presented to his primary care provider, complaining that he a seizure a month previously and injured his neck. Id. at 256. His nurse practitioner started him on 10 MG of Flexeril twice a day. Id. at 257. The provider continued to diagnose him with acute neck pain on September 19, 2012, but stopped his Flexiril prescription. Id. at 253. Plaintiff complained of neck pain at his next visit with this provider, on October 18, 2012 and a follow-up visit on January 7, 2013 Id. at 250, 249. This provider also noted that Plaintiff "[c]omplains of, neck pain since first seizures" during an April 2, 2013 visit. Id. at 247. Other examinations, however, did not note any problems with Plaintiff's neck. See R. at 263, 246. An x-ray taken on February 7, 2013 indicated "no fracture or dislocation" but "moderately severe degenerative disc disease at the C5-6 level." Id. at 267.

Plaintiff did not complain of neck problems when he testified, however, reporting that "just my, my seizures" limited his ability to work during the relevant period, May 15th, 2012 to September 2013. Id. at 36. Nothing else besides the conditions related to his seizures prevented him from working. Id. at 37. Plaintiff also complained of asthma and high cholesterol. Id. at 39. He denied any problems with walking, standing, bending stooping or squatting. Id. at 40. His seizures led to "twitching" in the hands. Id. The only testimony that Plaintiff provided about his neck was that at times this twitching included "different muscle groups. The one time my whole neck was–would twitch and I couldn't stop my head from moving, actually I had to hold it with both my hands[.]" Id. 44. Similarly, the independent medical examination performed by Dr. Prezio found that the "[c]ervical spine shows full flexion, extension, lateral flexion, extension, lateral flexion

11

bilaterally, and full rotary movement bilaterally." R. at 237.

The ALJ's opinion provided that Plaintiff suffered from the severe impairments of seizure disorder and asthma, and that "[i]n addition to claimant's severe impairments, the claimant also has non-severe impairments[.]" R. at 12-13. The ALJ identified one such impairment, hyperlipidemia. Id. at 13. That condition had been treated with Simvastatin and Crestor. Id. Plaintiff had not received other treatment, and "[b]ased on the lack of treatment and limited clinical findings" the ALJ concluded that "claimant's hyperlipidemia is not a severe impairment because it would not preclude the claimant from performing physical work activities pursuant to 20 CFR 404.1521." Id. The ALJ's only discussion of any injuries to Plaintiff's neck came in the context of the ALJ's initial findings concerning Plaintiff's seizure disorder. R. at 12. The ALJ noted that "[t]he claimant reported he had a seizure in August 2012 and injured his neck." Id. The ALJ did not discuss the severity of this injury or any treatment that Plaintiff received for it.

Plaintiff's position is that the ALJ erred by not discussing in any detail Plaintiff's complained-of neck impairment when assessing his RFC. He insists that the case be reversed or remanded to permit the ALJ to explain the role that Plaintiff's neck condition played in the RFC. The Court is unpersuaded by this argument. Courts have concluded that "[w]hen . . . the evidence of record permits us to glean the rationale of an ALJ's decision" the ALJ need not "have mentioned every item of tesitmony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983). A court should remand when the ALJ's rationale is unclear, but need not remand if the court can "'look to other portions of the ALJ's decision and to clearly credible evidence

12

in finding that his determination was supported by substantial evidence.'" Id. (quoting Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982)).

Here, the ALJ clearly explained that the medical record of a seizure disorder and related complications had lead to the RFC. Substantial evidence, including the medical record, the independent medical evaluation, and Plaintiff's own testimony supported this finding. The fact that the ALJ did not discuss the Plaintiff's neck pain does not undermine the existence of substantial evidence for the ALJ's findings. The evidence, as explained above, provides substantial evidence that Plaintiff's neck pain did not cause any significant limitations in his ability to work. Indeed, when Plaintiff testified before the ALJ, he did not cite neck pain as anything that limited him during the relevant period. His testimony, as did the RFC and the ALJ's written findings, concentrated on the way that his seizure disorder influenced his ability to work. Moreover, substantial evidence supported a finding that Plaintiff's seizure disorder caused the neck injury. The limitations that the ALJ assigned based on the seizure disorder could therefore be read to include injuries, such as Plaintiff's neck problems, caused by seizures. The ALJ did not need to discuss an injury that Plaintiff admitted did not affect his ability to work. The ALJ therefore had substantial evidence to support her decision not to assign any limitations due to Plaintiff's neck injury. Plaintiff's motion must be denied in this respect as well.

## VI. CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is **DENIED.** The Commissioner's motion for judgment on the pleadings is **GRANTED**. The decision of the Commissioner is affirmed.

13

**IT IS SO ORDERED.**

Dated: December 9, 2016

*Thomas J. McAvoy*
Thomas J. McAvoy
Senior, U.S. District Judge